**PAUL GOOD PH.D.**
**1738 Union Street, Suite 300**
**San Francisco, CA 94123-4425**

Specializing in Clinical                                   (o) 415-346-0607
& Forensic Psychology                                     (e) paulgoodphd@gmail.com
CA License PSY 7994

October 17, 2010

Mr.  Donald Bergerson
Attorney at Law
766 Capp Street
San Francisco, CA 94110

Re: Aspillera, Lily

Dear Mr. Bergerson:

Pursuant to your request, I have examined Ms. Aspillera for the purposes of assessing
her mental state, now and at the time of the offense.  In addition, you have asked that I
determine if there are factors in mitigation that would be important for the trier of fact to
consider.

Prior to the evaluation the consent and release forms were reviewed and signed.
Explanations regarding the likely or possible uses of the information collected, the limits
on confidentiality, and Ms. Aspillera's right to withdraw her consent and right to counsel
were provided to her.  She acknowledged that all of her questions were answered to her
satisfaction and she agreed to participate under the circumstances.

**EVALUATION PROCEDURES:**

1.  I spoke by telephone with Mr. Bergeson to get the facts of the case and relevant
    information;

2.  I interviewed Ms. Aspillera on September 14, 2010 and September 21, 2010 at
    my office;

3.  I administered the following psychological tests to Ms. Aspillera on September

Psychological Report
Aspillera, L.
Page 2 of 9

14, 2010 and September 21, 2010: Shipley Institute of Living of Scale-2; Beck
Depression Inventory-II;  Rotter Incomplete Sentences Blank; Millon Clinical
Multiaxial Inventory-III (MCMI-III), California Psychological Inventory (CPI).

## BACKGROUND INFORMATION:

Ms. Lily Aspillera is a 66-year-old married Filipina woman charged with multiple counts
of mail fraud and tax evasion stemming from the embezzlement of funds from a client
over a four year period, from 2004-2008.  She plead guilty to the charges and is now
awaiting sentencing in Federal court.

Ms. Aspillera was hired by Ernst & Young in 1999 as an Executive Assistant at
an annual salary of about $65,000.  She rose quickly to become a client service
specialist and by 2004 was making about $120,000.  She was considered a careful and
meticulous employee.  She serviced assets of high net worth clients with whom she met
approximately once per week.   At the home of her clients, she would write checks, pay
bills, handle administrative and accounting chores.

Beginning in 2004 or 2005, Ms. Aspillera began to write checks to herself from one
client she was servicing.  She estimates writing about one check to herself per week.
Over approximately four years, ending in June 2008, the amount embezzled was
between $1.7 million and $2.9 million.  The crime was discovered after an errant bank
statement made its way to the client.  Shortly thereafter, Ms. Aspillera left Ernst &
Young following two transient ischemic attacks (TIAs) at work, which led to her being
placed on disability.  She has not worked since 2008.

Ms. Aspillera expressed strong feelings of remorse and regret.  She stated, "People
gave me so much trust and I betrayed that trust..."  Ms. Aspillera reports
feeling "horrible" about her offense: "I feel so guilty...I've been very trustworthy all my
life.  I hate myself."  She acknowledged that she has no one to blame but herself.  This
woman accepts full responsibility for her actions.

She is upset thinking that the victim "hates" her, and she is aware of the hurt and
embarrassment that her actions caused her husband and children as well.  Ms.
Aspillera describes herself as a practicing Catholic who "fell from grace" and "fell into
sin" in committing her offenses.  Despite her noble intentions to help her sister, she
stated "I committed a crime.  It is a sin against God and humanity."

One year before she started to embezzle funds from her client, Ms. Aspillera's life

began to unravel out of control, as life threatening illness attacked her family and herself.  The stressful circumstances in both her immediate and extended family stretched from 2003 to 2008, when the crime was discovered, and continue to the present.

For example, Ms. Aspillera underwent an angioplasty in 2003 for a blocked artery.  In January 2004 she learned of her sister's Stage 4 breast cancer.  In May, her niece died of Lupus.  In June, her brother-in-law died of lung cancer.  And in September, Ms. Aspillera had a massive heart attack due to clogged arteries.  She required quintuple bypass surgery over a three month span.  In 2005, her sister's breast cancer disease spread to her bones.  In February 2006, another blockage in one of Ms. Aspillera's arteries precipitated a second angioplasty and insertion of a stent.  In August 2007, her sister succumbed to breast cancer and died.  In February 2008, her husband developed heart disease, i.e., viral cardiomyopathy.  In 2009, his illness went from bad to worse, he was in and out of the hospital, and he is now suffering with congestive heart failure.  And finally this year, Ms. Aspillera's husband had brain surgery for a subdural hematoma, and another brother-in-law died in a fatal car accident.

Ms. Aspillera offered some information that is relevant for how she got caught up in the crime.  Her husband had stopped working in 1995 and she was supporting the family.  Her heart attack and quintuple bypass surgery in 2003 and 2004 scared her about dying.  The doctors were impressed by how well she recovered, and her own family thought of her as invulnerable.  This put her under enormous pressure: "I had to be strong for everybody.  If I break down in pieces my entire family breaks down.  So I shut it [my heart condition] out of my mind because that was the only way I could survive."

She admitted that she became "greedy.  It was too easy.  No one was overseeing me.  It was like an obsession, and a desire to help my sister."  She went on to say: "It's like an addiction. I wanted to stop but I couldn't."  This woman claimed that during the period in which she was stealing the money, it allowed her "to escape the harsh realities of what I was going through."  But, she was "never at peace" and the offense "took its toll on my conscience and health."

## PSYCHIATRIC HISTORY/ SUBSTANCE USE HISTORY:

Ms. Aspillera denied experiencing significant trauma or life threatening illness during her childhood.  She did not have problems with anxiety or depression in her youth, nor did she experience symptoms of mania or psychosis.

In 2004, following the loss of her niece and brother in law, the stage 4 breast cancer in her sister and her own quintuple bypass surgery, illness, Ms. Aspillera began to suffer bouts of anxiety and depression.  She initially believed she could manage her symptoms without medication, but family and friends noticed her deterioration which included weight loss, daily depressed mood, problems with concentration, low energy, and hypersomnia.  Ms. Aspillera was ultimately prescribed Ambien for sleep.

She was never hospitalized for psychiatric reasons, or prescribed psychiatric medications.  She was also never treated as an outpatient in psychotherapy or counseling.  She has no known family history of mental illness.

Ms. Aspillera consumed alcohol socially, perhaps drinking a glass of wine once every six months.  She has not drunk alcohol in the past four years and has never experimented with drugs.

**PERSONAL AND SOCIAL HISTORY:**

Ms. Aspillera was born and raised in Pasay City in the Philippines. She is unaware of any problems with her birth and said she reached her developmental milestones without delay.  She has one brother (age 64) and three sisters (one age 69, one age 58, and one deceased).  She is very close with her family.  Her father died in 1991 at the age of 92, and is described as "loving, caring, thoughtful, very intelligent, he spoiled all of us - children and grandkids."  She was his favorite child, she recalled.  Her mother worked as a housewife, and was described as a "disciplinarian, she was our rock, a very good mother, the glue that kept our family together, caring."  Ms. Aspillera enjoyed spending time together in activities such as shopping.  Her parents remained together until their passing with a marriage that endured solidly for almost fifty years.  Discipline was described as only somewhat strict with few rules.  When Ms. Aspillera broke the rules, her mother would sit her down and talk to her.  She denied ever being physically, emotionally or sexually abused.

Ms. Aspillera attended two elementary schools (due to relocation) and was never held back or placed in special education classes.  She reported doing well in school and denied any problems with attention, hyperactivity, truancy, daydreaming and cheating.  Ms. Aspillera was consistently among the top ten percent of students in middle school.  During high school, she continued to excel and participated in drama.  She believed she was perceived as a leader. She graduate from high school with a 3.5 GPA, then attended college at the Philippine Women's University.  Although she did not graduate, she completed four years and was only about six units short of her Bachelors of

Science in Business Administration.  Ms. Aspillera additionally holds an interior design certificate.  She immigrated to the United States in 1980, at the age of 35.

This woman has a strong work ethic.  She most recently worked for nine years as an Executive Coordinator/Client Service Specialist at Ernst & Young.  Performance evaluations of her executive administration and client service duties were reportedly excellent until the offense. Prior to this she worked as an Assistant to the President at BHP Copper for two years.  Performance evaluations of her executive administration duties were excellent.  Before that she worked as a trade assistant for the Canadian Consulate for four years, and prior to that she was Executive Administrator to the Nigerian Consulate four years.  Other jobs she has held include working as an Executive Assistant for Macy's, and for Homestake Mining. Ms. Aspillera has been unemployed since 2008.  The defendant has not made any decision about future employment, but is eager "to get back on [her] feet, move on, and start a new life."

Ms. Aspillera reports that her finances are not in good standing.  She has received a personal loan which she paid back. Her credit rating is low. Ms. Aspillera never served in the military.

The defendant has been married once.  She has a close relationship with her husband, her only serious relationship.  Ms. Aspillera has three children.

Ms. Aspillera currently suffers from diabetes, heart disease, gout, and high blood pressure.  For these illnesses, she is currently taking a variety of medicines including Flavix, Metformin, Glipizid, Liseprinol, and Aspirin.

She reports that her heart condition scared her about dying.  The doctors told her she could drop dead at any time and she repressed her anxieties surrounding it.  "I shut it out of my mind because that was the only way I could survive.  I had to be strong for everybody.  If I break down in pieces my entire family breaks down."

## MENTAL STATUS EXAMINATION

Ms. Aspillera was on time for our interview.   She was dressed casually and appeared healthy and clean.  She displayed no unusual body movements or mannerisms. Her speech was articulate with a normal rate and volume.  She was alert and managed to follow the flow of the interview.  Her attitude was friendly, engageable and cooperative.

Ms. Aspillera displayed a full range of affect. She appeared depressed, and reported

a sense of hopelessness and helplessness.  This woman was regretful, remorseful, fretful, fearful, and anxious about her situation. She was not irritable or euphoric. Her affect was congruent to the situation and her thinking.  Her mood was reported as "very depressed."  She said her appetite has been diminished and that she has lost a significant amount of weight.  She denied having nightmares but her sleep is interrupted by "dark thoughts" and she is averaging only two hours per night.

The defendant's thought process was clear, coherent and goal directed.  She can read, pay attention and concentrate.  Her capacity for abstract reasoning was intact. Ms. Aspillera's immediate memory was good and she recalled remote events easily. Her thought content was appropriate to the situation and contained no paranoia.  Ms. Aspillera reported no abnormalities such as auditory or visual hallucinations/illusions, and she did not appear to be internally preoccupied.

This woman reported no current suicidal or homicidal ideation.  Her impulse control and judgment were adequate.  Her capacity for insight was limited.

## PSYCHOLOGICAL TESTING RESULTS

**Observations and test taking behaviors:**  Ms. Aspillera was cooperative with all aspects of the testing process and appeared motivated to do her best.  She was able to hear questions and instructions presented at normal conversational volume.  Nonverbal and verbal communication was consistent.  She completed the required procedures as requested.  Overall, these results appear to be a valid indicator of her current psychological functioning.

**Intellectual/Cognitive Functioning:**  Ms. Aspillera's performance on the Shipley Institute of Living Scale-2 yielded a composite standard score of 84, which falls at the 14th percentile rank. This suggests her overall cognitive abilities are in the **below average** range of adult intelligence.  Further analysis indicates her vocabulary score was in the average range, and her abstraction score was in the well below average range.  This is a large enough discrepancy such that her AQ score of 61.85 indicates that there are highly probable Shipley signs of cognitive impairment.  Given Ms. Aspillera's age, educational background and vocabulary knowledge, we would have expected her to perform better on the abstract portion of the test.  She seems to be having a problem with pattern recognition, sequential processing and abstract reasoning.  Ms. Aspillera is currently not functioning at a level consistent with her optimum intellectual capabilities. In the absence of a head injury or neurological illness, psychogenic factors may be interfering with the efficiency of her cognitive operations.

**Psychological Functioning:** Analysis of the validity and modifier indices of the self-report psychological inventories reveals both the CPI and the MCMI-III to be valid for interpretation.

The psychologic test data are consistent in showing signs of depression. Specific test signs of depression include a significant elevation of the MCMI-III Major Depressive Disorder (BR=80), an intermediate elevation of the MCMI-III Dysthymic Disorder (BR=70), and a Beck Inventory score of 45, which falls in the severe range of depressive symptomatology. In particular, she states that she feels guilty all the time, dislikes herself, blames herself for everything bad that happened, feels utterly worthless and has thoughts of killing herself but would not carry them out.

The Rotter Incomplete Sentences reveal themes of regret and emotional distress. For example, she states: "I regret committing the crime…I am very sorry for what I did…What pains me is the humiliation and pain I brought my family…I failed miserably…My mind is so confused...I hate myself…I suffer from deep depression and anxiety…I feel sad, depressed, angry at myself, scared…I can't function...My nerves are frazzled...I need to be strong for my family...I wish things could be different...The future is bleak."

The CPI indicates that Ms. Aspillera has important personality strengths. She tests as a person who is private, reserved, inwardly oriented and conventional. This type of person is assertive, responsible and usually asks little for themselves, giving much to others. Ms. Aspillera is likely to have a good measure of self-control and in most situations inhibits herself.

The MCMI-III reveals some personality tendencies in which she is lacking vitality, is disciplined and very regulated. Frequently individuals with this personality style are highly organized and perfectionistic. Interpersonally, she is somewhat withdrawn from others but polite and respectful of social conventions and proprieties. Cognitively, Ms. Aspillera's thoughts tend to be constricted and her self-image slightly complacent. She is not introspective, but she is conscientious, industrious and meticulous. Her intrapsychic organization tends to be compartmentalized.

## DISCUSSION AND OPINION:

Ms. Aspillera is an elderly woman who has pled guilty to fraud and embezzlement and is awaiting sentencing. She was referred for psychological assessment in order to

help explain the behavior that led to the instant offense, and to determine if there were factors in mitigation relevant to sentencing.

The instant offense is striking in that it took place over many years and involved so much money.  How could a basically good person do something so unconscionable?  What would lead this woman, who had no history of anti-social behavior and no criminal record, to repeatedly suspend her moral compass and behave in a way that was so out of character?

The clinical interview revealed Ms. Aspillera to be genuinely remorseful and regretful.  This religious woman feels that she sinned, and is repentant in every sense of the word.  Although she is quick to condemn herself for her behavior, she is slow to understand how the events of her life preceding and during the offense contributed to the crime.  She was aware of the immediate cause of her embezzlement: wanting to send her sister money for medical care, and she appreciated how a lack of supervision and easy access to the funds created the opportunity.  She was partially correct in describing her dependence on the money and the difficulty of stopping the stealing as an "addiction."  But Ms. Aspillera was not at all appreciative of the role played by the tremendous vulnerability and anxiety about death that crept into her life at about the same time she started to embezzle funds.

Following her first angioplasty in 2003, this woman was subjected to a string of losses and life threatening illness in her family.  In a devastating and demoralizing 2004, Ms. Aspillera learned of her sister's stage four breast cancer, and experienced the death of her niece and brother in law.  Then, in September 2004, she had a massive heart attack and required quintuple bypass surgery.  This woman was face to face with death, her own and that of members of her family.  It was terrifying, and she lacked the psychological maturity to cope with such stress.

The fact that her husband was no longer working due to his medical condition placed even more strain on her.  The reality was that she had a good job, was making a good salary and didn't need to steal from her client.  The impulse was irrational, and in my analysis, came from a sense of fragility and fear.  In an unconscious calculation, the funds she stole were proportional to the level of her anxiety, and an attempt to allay her concerns about death and dying.

Psychological testing data were consistent with the interview findings.  Ms. Aspillera is significantly depressed.  She is withdrawn and feeling isolated.  This woman tests as an assertive, responsible and conventional person.  There are compulsive personality

trends that make her rigid, meticulous and formal.  There were no test indications of anti-social, narcissistic or sadistic-aggressive tendencies.  She is not a psychopath.

I would like to take this opportunity to indicate for the record that great care was given to assessing whether or not Ms. Aspillera might be malingering, since symptom over-reporting to avoid responsibility or to obtain special dispensations is always a concern in forensic evaluations. It is my opinion that Ms. Aspillera is not malingering and is suffering from a genuine depression.  Moreover, Ms. Aspillera made no effort to fabricate an explanation or excuse for her fraud and embezzlement.  Instead, she has owned up to her mistake in full.

Thank you very much for referring this very interesting case.

Sincerely,



Paul Good, Ph.D.
Clinical and Forensic Psychologist

UCSF Medical Center                                              Report Generated: 10/01/10
Transcriptions by MRN and Date Range                            Reporting Period: 01/01/05 to 10/01/10

---

MRN: 12862202                         Visit #:  17504911
Patient Name: ASPILLERA, Lily C       Provider: Thorson, Anne I
Date Entered: 05/30/10 20:04          Date of Service: 04/21/10 00:01

---

Cardiology Note

### UCSF CARDIOLOGY

| | | |
|---|---|---|
| 350 Parnassus Avenue | 505 Parnassus Avenue | 1300 South Eliseo Drive |
| Suite 300 | Room M-1176 | Suite 204, Greenbrae |
| Box 0327 | Box 0124 | Box 0327 |
| San Francisco, CA 94143 | San Francisco, CA 94143 | San Francisco, CA 94143 |
| Tel: (415) 353-2873 | Tel: (415) 476-1326 | Tel: (415) 353-2873 |
| Fax: (415) 353-2528 | Fax: (415) 502-8627 | Fax: (415) 353-2528 |

CARDIOLOGY CLINIC AT 350 PARNASSUS
CARDIOLOGY CLINIC AT 505 PARNASSUS
CARDIOLOGY CLINIC AT GREENBRAE

April 21, 2010
RE:
U#: 12862202
SERVICE DATE:  04/21/10
CHIEF COMPLAINT/HISTORY OF PRESENT ILLNESS:  This patient returns to the Cardiology Clinic today, April 21st, 2010 for a follow-up visit.  She states that since her previous visit, she has been under a tremendous amount of stress with her husband being ill with severe cardiomyopathy. She has essentially had to take over his care including helping him with medications.  She states that she is providing essentially full-time care and this has not allowed her to take adequate care of herself.  She has been checking her blood sugars sporadically but states that they seem to be under slightly better control.  She is worried about her blood pressure given the recent stress she has been under.  She does not describe any chest discomfort, arm, neck or jaw pain.  She has not experienced any shortness of breath at rest and denies dyspnea on exertion or effort intolerance except that she notes she is more fatigued than usual.
She denies paroxysmal nocturnal dyspnea, orthopnea or lower extremity edema.  She does not report any recent palpitations, rapid or irregular heartbeat, lightheadedness or presyncope.
PAST MEDICAL HISTORY:  Her past medical history is significant for:
1.  Gout.
2.  Hypertension.
3.  Coronary artery disease, status-post coronary artery bypass

---

UCSF Medical Center                                              Report Generated: 10/01/10
Transcriptions by MRN and Date Range                            Reporting Period: 01/01/05 to 10/01/10

---

MRN: 12862202                          Visit #:  17504911
Patient Name: ASPILLERA, Lily C        Provider: Thorson, Anne I
Date Entered: 05/30/10 20:04    Date of Service: 04/21/10 00:01

---

Cardiology Note                        (continued)

surgery.
4.  Seborrheic dermatitis.
5.  Diabetes mellitus.
6.  History of post-cardiotomy pericarditis.
CURRENT MEDICATIONS:  Her current medications are as listed on the STOR
sheet.
ALLERGIES:  She has no known drug allergies.
Family history and social history were reviewed from prior date July
18th, 2007 and are without significant change.
REVIEW OF SYSTEMS:  Review of systems is pertinent for recent difficulty
sleeping, increased stress and anxiety, occasional headache, decreased
visual acuity, occasional dyspepsia, and intermittent nocturia.  The
remainder of the review of systems is negative.
PHYSICAL EXAMINATION:  On physical examination today, blood pressure is
139/62, heart rate is 89, respirations 14, oxygen saturation 99% on room
air.  Weight is 113.5 lbs and temperature 36.5 .  In general, she is a
well developed, thin, fatigued appearing woman in no acute distress.
HEENT exam atraumatic, normocephalic.  Eyes pupils equal, round,
reactive to light, extra ocular movements intact.  Sclera are anicteric.
Oropharynx is clear.  Neck is supple, no lymphadenopathy or thyromegaly.
Jugular venous pressure is 7 cm.  Carotid upstroke is normal without
bruit.  Chest is clear to auscultation and percussion without wheezes or
rales.  Cardiac exam reveals regular rhythm, S1 and S2 are normal, and I
could appreciate no gallop or rub.  Abdomen is soft, non-tender.  Normal
active bowel sounds are present.  Extremity exam reveals no cyanosis,
clubbing or edema and the distal pulses are 1+ and symmetric.
Neurologic exam is non-focal.
LABORATORY STUDIES:  No recent laboratory data is available for review.

IMPRESSION / PLAN:
1.  Coronary artery disease, status-post coronary artery bypass surgery
and stent placement with no symptoms of active ischemia and negative
recent stress test.  We will continue the current medication regimen.
2.  Hypertension, better control now on the current medications.  We
will continue the Toprol XL 75 mg daily; she is to keep a log of her
blood pressures and if they are over 146 systolic, I have recommended
that she up-titrate the Toprol to 100 mg daily.
3.  Diabetes mellitus, still sub-optimal hemoglobin A1c.  She will
follow-up with her primary care physician regarding management.

---

UCSF Medical Center
Transcriptions by MRN and Date Range

Report Generated: 10/01/10
Reporting Period: 01/01/05 to 10/01/10

| | |
|---|---|
| MRN: 12862202 | Visit #:  17504911 |
| Patient Name: ASPILLERA, Lily C | Provider: Thorson, Anne I |
| Date Entered: 05/30/10 20:04 | Date of Service: 04/21/10 00:01 |

Cardiology Note                              (continued)

    4.  Hyperlipidemia, no recent laboratory data available for review.  We
will check cholesterol, cholesterol fractions and liver function tests
with her next blood evaluation.  She will continue Lipitor and we will
adjust the dosage depending on her blood test results.  I have again
counseled her regarding a diet and exercise program.
She will return to see us in six months or as needed.


ANNE THORSON, M.D.
ASSOCIATE CLINICAL PROFESSOR
EXTRA COPIES:


CARBON COPIES:


DICTATED BY:                    Anne I. Thorson, MD 12344


                                Electronically Signed by
                                Anne I. Thorson, MD 06/01/2010 10:47 A
                                _____
ATTENDING PHYSICIAN:            Anne I. Thorson, MD 12344
D:    05/30/2010 08:04 P
T:    05/31/2010 09:18 A a42  CS#: 2390017


Signed by: Thorson, Anne I          12344
Electronically Signed: 06/01/10 10:47

# UCSF Medical Center

**Complete Page 1 for ALL patients.**
**Complete additional Pages 2 and 3 for**
**ALL Home Care, SNF, and Transfer patients.**

## PATIENT DISCHARGE PLAN (PDP)

UNIT NUMBER

PT. NAME
128 66 99-2        IP    CAR
BIRTHDATE ILLERA, HECTOR NOEL
DOB 03/16/1942    67    M
1 1021244 ADM DT 12/28/2009
LOCATION                    DATE

| Admit Date | Discharge Date | Discharge Time | Attending Physician and ID# | Service | ICD CODES |
|---|---|---|---|---|---|
| 12/28/09 | 12/31/09 | 2 pm | Foster | Cards 4 | |

| Principal Diagnosis: Heart Failure |
|---|

Secondary Diagnoses: Acute renal failure , on chronic kidney Disease , Afib on coumadin , coumadin overdose

| Principal Procedure | | Date: |
|---|---|---|
| Other Procedure #2 | | Date: |
| Other Procedure #3 | | Date: |
| Other Procedure #4 | | Date: |

*If patient had more than 4 procedures please record procedure/date below for benefit of primary M.D.*

| **Discharge Condition:** | ☐ Good   ☑ Fair   ☐ Poor |
|---|---|
| **Disposition:** | ☑ Home  ☐ Home w/ services  ☐ SNF  ☐ Acute Rehab  ☐ Left "Against Medical Advice"  ☐ Expired  ☐ Other Facility: _____   ☐ Other Hospital: _____ |
| **Discharge Diet:** | ☐ No restrictions  ☑ Carbohydrate Controlled  ☐ Dysphagia/Soft Chewable  ☑ Renal  ☑ Low Sodium  ☑ Fluid Restriction: 1200 mL/day  ☐ Other: _____ |
| **Activity Level:** | ☑ No restrictions  ☐ Walk at least ___ x day  ☐ No bending/twisting of spine  ☐ No strenuous activity  ☐ Bedrest  ☐ Out of bed to chair for meals  ☐ No driving: _____ days  ☐ Do not lift >20 lbs  ☐ OK to shower/tub  ☐ Limit sitting duration: _____ minutes  ☐ Other: _____ |

**Clinical Summary and Post-Discharge Objectives: (see dictation # _____ for a detailed summary)**

67 M h/o non-ischemic DCM, CKD, DM who p/w ARF. Given his poor
RV systolic function he was placed on a dobutamine gtt and his lasix
was held. After 48 hrs he experienced a significant improvement in his
renal function with a cr of 3.1 from 4.3 on admission. Renal was consulted
who thought he was prerenal in cardiorenal syndrome and will continue to
follow him as an outpt. Heart Failure was also consulted and will evaluate
him for a heart transplant as an outpt. He was also supratherapeutic
on coumadin w/ an INR = 5.1. His coumadin was held and his dose was
decreased & the plan for him to followup at clinic as below.

| Future Goals: |
|---|

M.D. Responsible for Dictation and ID#: Sames 75978

M.D. Completing this form and ID#: Sames 75978

*Follow-Up Care and Referrals*

| Provider Name | Clinic | Location | Date | Time |
|---|---|---|---|---|
| Francine Deier | Anticoag Clinic | | 1/5 | 9:30 AM |
| Dana McGlothlin | Heart Failure | 400 Parnassus | 1/28 | 9:45 AM |
| Echo / Dr. Thomson | Cardiology clinic | | 3/10/10 | 1:15 pm |
| Renal clinic will contact pt for an appt | | | | |
| Cardiac EP clinic will contact pt for an appt | | | | |

Page 1 of ____

105-0069 (Rev. 1/06) WorkflowOne   ORIGINAL - MEDICAL RECORD COPY

**PATIENT DISCHARGE PLAN (PDP)**

## University of California San Francisco
## Coding Summary
Print Date: 1/6/2010  4:00:27PM

JAN 0 8 2010

| Patient Name: Aspillera, Hector N | Billing Number: 17027249 | MRN: 12866992 |
|---|---|---|

| | | | |
|---|---|---|---|
| Date of Birth: | **3/16/1942** | Sex: | **MALE** |
| Age at Admit: | **67 years** | Race: | **NATIVE HAWAIIAN / OTH PACIFIC ISLANDER** |
| Admit Date/Time: | **12/28/09  11:23 pm** | Disch Date/Time: | **12/31/09  4:04 pm**   Total Charges: **$ 29,931.66** |
| Attend Phys: | **00050783  Foster, Elyse** | Financial Class: | **J     MEDICARE PART B ONLY** |
| Patient Type: | **I     INPATIENT** | Payor 1: | **B01 MEDICARE A I/P TEC** |
| Det Pt Type: | **IP     INPATIENT** | Payor 2: | |
| Disch Service: | **CAR     CARDIOLOGY** | Payor 3: | |
| Admit Dx: | **584.9     Acute kidney failure NOS** | Discharge Status: ROU HOME | |

| DRG Description | | MDC | Weight | GMLOS | ALOS | Expect Reimb | Coder ID | Coded Date | Final Date |
|---|---|---|---|---|---|---|---|---|---|
| 291  HEART FAILURE & SHOCK W MCC | | 005 | 1.4609 | 5.00 | 6.40 | $ 540,202 | MACDONAD | 01/06/2010 | 01/06/2010 |

| APR DRG | Description | | APR MDC | APR SOI | APR ROM | APR DRG Weight |
|---|---|---|---|---|---|---|
| 194 | HEART FAILURE | | 005 | 3 | 3 | 1.3262 |

| Seq | Diagnosis | POA | Description | APR ROM Level | APR SOI Level |
|---|---|---|---|---|---|
| 1 | 428.0 | Y | Congestive heart failure, unspecified | P-Principal diagnosis used for SOI/ROM calculation | P-Principal diagnosis used for SOI/ROM calculation |
| 2 | 584.9 | Y | Acute kidney failure, unspecified | 4-Extreme | 4-Extreme |
| 3 | 427.31 | Y | Atrial fibrillation | 2-Moderate | 1-Minor |
| 4 | 250.00 | Y | Diabetes mellitus without complication, type II or unspecified type, not stated as uncontrolled | 1-Minor | 1-Minor |
| 5 | 403.90 | Y | Hypertensive chronic kidney disease stage I through stage IV, or unspecified, unspecified benign or malignant | 2-Moderate | 2-Moderate |
| 6 | 585.9 | Y | Chronic kidney disease, unspecified | 1-Minor | 1-Minor |
| 7 | 285.21 | Y | Anemia in chronic kidney disease | 1-Minor | 1-Minor |

| Seq/Ep | Procedure | Modifiers 1 2 3 4 5 | Start | End | Provider | Role |
|---|---|---|---|---|---|---|

**Consult Performed By**
00038494  Shaw, Robin M
00040215  Cho, Kerry C

Prepared by: Softmed Systems, Inc.®
\\APPMCB11\SOFTMED\SOFTMED\CTC\REPORTS\CA\Custom\Coding Summary.rpt

Printed by: Macdonald, David

# UCSF Medical Center

**DISCHARGE/FOLLOW-UP SUMMARY**

**PLEASE BRING THIS WITH YOU TO YOUR FIRST DOCTOR VISIT**

UNIT NUMBER

PT. NAME
128 66 99-2    IP    CAR
BILLERA,HECTOR NOEL
BIRTHDATE
DOB 03/16/1942    67    M
1702124 9 ADM DT 12/28/2009
LOCATION                    DATE

Diagnosis/Surgeries/Procedures *Heart failure, acute renal failure, PN,*
*Chronic Kidney disease, Afib on coumadin, coumadin overdose.*

Doctor at the time of discharge: *Foster*

**Discharge to:** ☒ Home  ☐ Acute facility  ☐ Sub-acute facility  ☐ Acute rehab  ☐ Hospital based SNF
☐ Free standing SNF  ☐ I/P Hospice  ☐ Med psych  ☐ Other (Specify) _____
Name of facility _____

Person accepting responsibility for patient: ☒ self  ☐ family  ☐ other _____

Mode of transportation: ☒ self/family  ☐ taxi  ☐ ambulance/phone # _____ pick up date/time _____

## Referrals / Follow-up for your care

| Follow-up | Location | Phone # | Appointment/Delivery Date/Time |
|---|---|---|---|
| Dr. *Francine Deren* | *Anticoagulation Clinic* | | *1/5/10  0930 am* |
| Dr. *Dana McGlothlien* | *Heart failure  400Parnassus* | | *1/28  945 am* |
| Dr. *echo / Dr. Thornton* | *Cardiology clinic* | | *3/10/10  1:15 pm* |
| ☐ Home Care Agency: *Renal and cardiac Ex will contact patient with appts.* | | | |
| ☐ RN  ☐ PT/OT  ☐ Home health aid  ☐ SW  ☐ | | | |
| ☐ Infusion Company: | | | |
| ☐ Equipment Company: | | | |
| ☐ cane/walker  ☐ crutches/wheelchair  ☐ oxygen  ☐ commode  ☐ hospital bed  ☐ | | | |
| ☐ Supply Company | | | |
| ☐ ostomy  ☐ tracheostomy  ☐ wounds  ☐ tube feedings | | | |

☒ If you smoke, STOP ALL smoking/tobacco use. *(Access our patient education library online at www.ucsfhealth.org for additional information)*

## Discharge Instructions until your first doctor's appointment:

Name(s) of teaching record(s) for self care instructions: _____ ☐ none

**Medications:** ☐ none  ☒ reviewed by my nurse  ☐ resume pre-hospital medications  ☐ prescriptions
☐ see Medication Schedule (complex meds) as per doctor's orders    reviewed by my doctor
☐ reviewed by my pharmacist

## DISCHARGE INSTRUCTIONS FOR PATIENTS WHO DO **NOT** RECEIVE A TEACHING RECORD:

Name(s) of pamphlet(s) given to patient: *Fluid Restriction of 1200 ml/day* ☐ none

Diet: ☐ no restrictions  ☒ special diet (specify) *Low sodium, Carbohydrate controlled, renal*

Activity: ☒ no restrictions  ☐ no lifting > 10 pounds for _____ days  ☐ no shower/tub for _____ days
☐ no driving for _____ days  ☐ other _____

Treatments prescribed by your doctor: ☐ none  ☐ incisional care

☐ place dry dressing on _____ after bathing  ☐ place wet to damp dressing on(site) _____ every _____
☐ use nebulizer/inhaler every _____
☐ taught _____ with return demonstration.

Notify your doctor if you have any of .the following, especially:
☒ fever          ☒ blood sugar < 70 or > 400    ☒ shortness of breathing/wheezing    ☒ dizziness/fainting
☐ worse pain    ☐ drainage from wound          ☒ burning, urgency, freq. of urination  ☒ palpitations
☒ numbness      ☐ bleeding from wound          ☒ blurry vision                        ☐ chest pain **not relieved by Nitro**
☐ redness near wound                            ☒ headache                             ☒ new onset chest pain
☐ other _____                                                                   ☒ swelling rapid weight gain
                                                                                       ☒ confusion/seizures

**Signatures:** I understand the above instructions and have a copy of them. ☐ Interpreter used ____

Discharge RN: *C Coblera*                    Patient/Family: X _____

Other instructor/title: _____    Social Worker: _____

Other instructor/title: _____    Discharge date/time: _____

602-4402 (Rev. 05/08) WorkflowOne    ORIGINAL – MEDICAL RECORD COPY    YELLOW – PATIENT COPY    PINK – NURSING COPY



# UCSF Medical Center
505 Parnassus Ave., San Francisco, CA 94143
(415) 476-1000

### UCSF Children's Hospital

## DISCHARGE PRESCRIPTION & MEDICATION LIST

**PLEASE BRING THIS LIST TO YOUR PHARMACY AND ALL CLINIC VISITS**
PROVIDERS: <u>MAKE SURE TO RECONCILE ALL PRE-HOSPITALIZATION AND CURRENT MEDICATIONS.</u> LIST ALL MEDICATIONS THAT WILL BE TAKEN AFTER DISCHARGE, INCLUDING HERBALS AND OTC'S.

| | |
|---|---|
| UNIT NUMBER | |
| PT. NAME | |
| BIRTHDATE | 128 66 99-2    IP    CAR |
| | ASPILLERA.HECTOR NOEL |
| | DOB 03/16/1942    67  M |
| | 1702 1249 ADM DT 12/28/200 |
| LOCATION | DATE |

**PATIENT'S ALLERGIES** _____  ☑ NKDA  WT ____ KG

For transfers to outside facilities

## THE PATIENT **WILL** BE TAKING THESE MEDICATIONS:

**EL PACIENTE ESTARÁ TOMANDO ESTOS MEDICAMENTOS / 病人要服用以下藥物：**

Check this box to indicate that the patient already has this medication at home

| | MEDICATION NAME | STRENGTH | QTY | DIRECTIONS | # OF REFILLS | DO NOT FILL | TIME OF LAST DOSE |
|---|---|---|---|---|---|---|---|
| 1 | Digoxin | 0.125mg | 30 | Po every other day | 0 | | |
| 2 | ASA | 81mg | 30 | Po daily | 0 | | |
| 3 | Atorvastatin | 30mg | 30 | Po at bedtime | 0 | | |
| 4 | Loreg | 25mg | 60 | Po BID | 0 | | |
| 5 | Lasix | 40mg | 100 | Po BID | 0 | | |
| 6 | Paxil | 10mg | 30 | Po daily | 0 | | |
| 7 | Omeprazole | 40mg | 30 | Po daily | 0 | | |
| 8 | Niacin | 500mg | 30 | Po daily | 0 | | |
| 9 | Glyburide | 10mg | 60 | Po BID | 0 | | |
| 10 | Metformin | 500mg | 60 | Po BID | 0 | | |
| 11 | Colace | 100mg | 60 | Po BID | 0 | | |
| 12 | Potassium Chloride | 10mEq | 30 | Po daily | 0 | | |
| | Coumadin | 2mg | 7 | Po on 1/2 and 1/4 | 0 | | RN Initials |

## THE PATIENT **WILL NOT** BE TAKING THESE MEDICATIONS ANYMORE:

**EL PACIENTE YA NO ESTARÁ TOMANDO ESTOS MEDICAMENTOS NUNCA MAS / 病人不要服用以下藥物：**

STOP 1 Enalapril
STOP 2 metoprolol
STOP 3

STOP 4
STOP 5
STOP 6

**PATIENT'S ADDRESS** _____  **DATE** _____

**PATIENT'S PHARMACY** _____  TEL# ( ) _____  FAX# ( ) _____

**PRIMARY PROVIDER** _____  TEL# ( ) _____  FAX# ( ) _____

| PRESCRIBER'S NAME (Print) | SIGNATURE | HOUSE OFFICER NAME (Print) | |
|---|---|---|---|
| Elyse Foster | 56783 | Tacera Sames | |
| | | SIGNATURE | PHONE/PAGER # |
| CA LIC # | DEA # | PHONE/PAGER # | 75978 |
| G69541 | AF2548064 | 353 1601 | 353 1601 |

| PHARMACIST NAME (Print) | SIGNATURE | ☐ This Form Faxed to Primary Care Provider |
|---|---|---|
| | | Prescription-Pharmacy Status: ☐ Called ☐ Faxed ☐ Given to patient |

**FOR PROBLEMS FILLING THIS PRESCRIPTION, PLEASE CALL (415)** _____  (☐ phone ☐ pager)

ORIGINAL - PHARMACY COPY   WHITE - MEDICAL RECORD COPY   YELLOW - PATIENT COPY

104-0012 (Rev. 5/08)   WorkflowOne



**UCSF Medical Center**
505 Parnassus Ave., San Francisco, CA 94143
(415) 476-1000

**UCSF Children's Hospital**

UNIT NUMBER

PT. NAME

```
128 66 99-2      IP   CAR
ASPILLERA, HECTOR NOEL
DOB 03/16/1942   67 M
1702724 ADM DT 12/28/2009
```
LOCATION

# DISCHARGE PRESCRIPTION & MEDICATION LIST

**PLEASE BRING THIS LIST TO YOUR PHARMACY AND ALL CLINIC VISITS**
**PROVIDERS:** <u>MAKE SURE TO RECONCILE ALL PRE-HOSPITALIZATION</u>
<u>AND CURRENT MEDICATIONS.</u> LIST ALL MEDICATIONS THAT WILL BE
TAKEN AFTER DISCHARGE, INCLUDING HERBALS AND OTC'S.

PATIENT'S ALLERGIES _____  ☐ NKDA  WT _____ KG

For transfers to outside facilities
Check this box to indicate
that the patient already
has this medication at home

## THE PATIENT **WILL** BE TAKING THESE MEDICATIONS:
**EL PACIENTE <u>ESTARÁ</u> TOMANDO ESTOS MEDICAMENTOS / 病人要服用以下藥物：**

| | MEDICATION NAME | STRENGTH | QTY | DIRECTIONS | # OF REFILLS | DO NOT FILL | TIME OF LAST DOSE |
|---|---|---|---|---|---|---|---|
| 1 | Coumadin | 2mg | 2 | PO 1/1 and 1/3 | ∅ | | |
| 2 | Coumadin | 1.5 mg | 2 | PO 1/2 and 1/4 | ∅ | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |

## THE PATIENT **WILL NOT** BE TAKING THESE MEDICATIONS ANYMORE:
**EL PACIENTE YA <u>NO ESTARÁ</u> TOMANDO ESTOS MEDICAMENTOS NUNCA MAS / 病人不要服用以下藥物：**

RN Initials

| | | | |
|---|---|---|---|
| 🛑 1 | | 🛑 4 | |
| 🛑 2 | | 🛑 5 | |
| 🛑 3 | | 🛑 6 | |

PATIENT'S ADDRESS _____  DATE _____

PATIENT'S PHARMACY _____ TEL# ( ) _____ FAX# ( ) _____

PRIMARY PROVIDER _____ TEL# ( ) _____ FAX# ( ) _____

| PRESCRIBER'S NAME (Print) *Elyse Foster* | SIGNATURE  50783 | HOUSE OFFICER NAME (Print) *Teresa Sur* |
|---|---|---|
| CA LIC # GG 9541 | DEA # AF 2548064 | PHONE/PAGER # 3531061 | SIGNATURE ____ 73971 | PHONE/PAGER # 3531061 |

| PHARMACIST NAME (Print) | SIGNATURE | ☐ This Form Faxed to Primary Care Provider |
|---|---|---|
| | | Prescription-Pharmacy Status: ☐ Called ☐ Faxed ☐ Given to patient |

**FOR PROBLEMS FILLING THIS PRESCRIPTION, PLEASE CALL** (415) _____ (☐ phone ☐ pager)

*104-0012 (Rev. 5/08) WorkflowOne*

ORIGINAL - PHARMACY COPY    WHITE - MEDICAL RECORD COPY    YELLOW - PATIENT COPY

U.C.S.F. MEDICAL CENTER, STOR/CDS SYSTEM

Patient Name: ASPILLERA, HECTOR NOEL          Printed on 01-28-10 at 03:46 pm
MRN:          1286699-2                                              Z123
DOB:          03/16/1942

DOCUMENT # 2281069   Prelim
VISIT #    17153712

                        DIVISION OF CARDIOLOGY
                         400 Parnassus Avenue
                         Sixth Floor, Box 0327
                    San Francisco, California 94143-0327
                 Tel: (415) 353-2873    Fax: (415) 353-2528
                         HEART TRANSPLANT CLINIC
January 28, 2010
  rry C Cho, M.D.
ʙox 0532
UCSF Campus Mail
Anne I. Thorson, M.D.
Box 0214
UCSF Campus Mail
Danielle Anne Eigner
ˋox 1950
 CSF Campus Mail
RE: x
U#: 12866992
DATE OF SERVICE: 01/28/10
Dear Colleagues:
We had the pleasure of seeing this patient at the University of
California, San Francisco Advanced Heart Failure and Heart
Transplantation Clinic on January 28, 2010, for evaluation and
ⁿonsideration for cardiac transplantation.  As you know, he is a
 ˋ-year-old man with a history of non-ischemic dilated cardiomyopathy
with last ejection fraction of 35-40%, ACC/AHA stage C, New York Heart
Association class II to III heart failure symptoms who also has diabetes
mellitus, chronic kidney disease, atrial fibrillation on Coumadin,
hypertension and hyperlipidemia.  He is here for initial evaluation for
consideration for cardiac transplantation.
The patient was seen by the Congestive Heart Failure and Heart
Transplant Service during his hospitalization in December 2009.  At that
time, the patient received inotropic therapy with dobutamine and was
discharged with a plan for right heart catheterization to evaluate his
filling pressures, given the fact that there was a feeling he may have
been fluid overloaded.  However, unfortunately, the patient did not
receive his right heart catheterization and he presents to clinic today
for formal evaluation.
The patient's heart failure history started in early 2008 when he was
ʰospitalized for congestive heart failure and was diuresed for fluid
 verload.  His initial symptoms were shortness of breath as well as
swelling in the lower extremities.  During his admission at UCSF, he
underwent right and left heart catheterization, which revealed elevated
left and right-sided filling pressures and diffuse coronary calcium, but
no significant coronary artery disease to explain his low ejection
fraction.  He also had low cardiac output.  Since his initial diagnosis

f heart failure in early 2008, the patient has been on medical therapy and under the care of a cardiologist. He had not been hospitalized for heart failure subsequently until December 2009 when, per the patient, he felt fatigue, shortness of breath with exertion and dehydration symptoms. Prior to his hospitalization, his Lasix had been increased to 80 mg twice daily and, although there was a component of heart failure during his admission and the patient was placed on inotropic therapy, it was unclear what his true filling pressures were. He was discharged on his medication regimen, but decreased on his Lasix regimen to 60 mg twice daily. He was taken off his ACE inhibitor which was enalapril prior to admission and has not been on this medication since. His creatinine during admission in December 2009 was as high as the 3 range and, although hemodialysis was considered at that time as a necessary option in the future, subsequent laboratory analysis has revealed that his creatinine has returned to 1.9. He has seen Renal as an outpatient, who does not feel hemodialysis is currently necessary and will continue to follow him. They do feel that an ACE inhibitor would not be harmful and, in fact, potentially beneficial for his proteinuria from their rspective. Per report, Dr. Thorson also has been considering starting ACE inhibition once again.

From a symptom perspective, the patient states that he has no chest pain at rest or with exertion. He denies any palpitations, syncope or lightheadedness. He denies any paroxysmal nocturnal dyspnea and has stable three-pillow orthopnea. He denies any lower extremity edema. At baseline, he is able to walk four blocks before he becomes fatigued and hort of breath. He is only able to walk one flight of stairs before he ecomes fatigued and short of breath. He is limited also by right knee pain. He said for the past 6 months, he has not been able to golf because of his worsening symptoms. The patient has recently seen Dr. Thorson in evaluation this month and has been scheduled to see Electrophysiology for consideration of ICD with Dr. Badhwar. He also received cardiopulmonary exercise testing, which revealed a VO2 of 8.2.

PAST MEDICAL HISTORY:
1.    Non-ischemic dilated cardiomyopathy with last ejection fraction of 35-40% on echocardiogram performed in October 2009, ACC/AHA stage C, HA class II to III heart failure symptoms.
2.    Atrial fibrillation on Coumadin for stroke prophylaxis.
3.    Chronic kidney disease with acute on chronic renal failure on December 2009 hospital admission, now back to near baseline with a creatinine of 1.9.
4.    Diabetes mellitus.
5.    History of non-sustained ventricular tachycardia.
6.    Hypertension.
7.    Hyperlipidemia.

CURRENT MEDICATIONS:
1.    Glyburide 10 mg twice daily.
2.    Lipitor 20 mg once daily.
3.    Metformin 500 mg twice daily.
4.    Coumadin 1.25 mg one tablet daily, except one-half tablet on Tuesdays and Fridays.
5.    Coreg 25 mg twice daily.
6.    Lasix 60 mg twice daily.
7.    Potassium 10 mEq daily.
8.    Niaspan 500 mg once daily.
9.    Omeprazole 40 mg once daily.
10.   Digoxin 0.125 mg every other day.
11.   Aspirin 81 mg once daily.

2.   Paxil 10 mg once daily.
ALLERGIES:  No known drug allergies.
SOCIAL HISTORY:  He is a retired import-export businessman.  He is
married and lives with his wife in West Portal.  He has three children
and good support.
HABITS:  He quit tobacco 30 years ago.  He does not drink any alcohol
and has no history of cocaine, crack or methamphetamine use.
FAMILY HISTORY:  He denies any coronary artery disease or history of
sudden cardiac death.
REVIEW OF SYSTEMS:  Otherwise negative in detail, other than as listed
in the history of present illness.
PHYSICAL EXAMINATION:  Vital signs:  Weight 167.2 pounds, height 5 feet
11 inches, temperature 36.1, heart rate 65, blood pressure 134/72,
oxygen saturation 97% on room air.  In general, he is alert and oriented
x3, a pleasant Filipino male in no acute distress.  HEENT:
Normocephalic, atraumatic.  Pupils are equal, round and reactive to
light.  Extraocular movements are intact.  Sclerae are anicteric.  Neck
is supple without thyromegaly.  Chest has scant crackles in bilateral
 ses.  Cardiovascular exam:  Jugular venous pressure is 14 cm of water
with positive hepatojugular reflux.  He does have a Kussmaul sign.
Carotids are 2+ without bruits.  Heart is irregularly irregular with a
2/6 systolic murmur at the apex.  Point of maximal impulse is laterally
displaced.  There is no S3 or S4.  There is no right ventricular heave
or pulmonary artery tap.  Abdomen is non-tender and non-distended.
Liver is palpable 2 cm below the costal margin.  Extremities are with 1+
 dema.  Pulses are 2+ throughout.  Neurologic exam is grossly intact.
 ATA ANALYSIS:  EKG performed on January 19, 2010, reveals atrial
fibrillation with low voltage QRS in the limb leads and non-specific
ST-T changes in the lateral leads.
Most recent laboratory analysis was performed on January 26, 2010.  His
white count was 7.6, hematocrit 32.7, platelets 224, sodium 138,
potassium 3.7, chloride 97, bicarbonate 30, BUN 19, creatinine 1.95.
Most recent echocardiogram was performed on October 26, 2009.  Ejection
fraction was 38%.  Left ventricular volume was normal.  Mild left
 entricular hypertrophy that was eccentric.  His ejection fraction was
  tween 35 and 40%.  Global hypokinesis with regional variation.  There
was severe right atrial enlargement and severe left atrial enlargement.
The aortic valve was sclerotic without restriction.  Pulmonary artery
systolic pressure was 46-51 with right atrial pressure 11-15.  There was
trace pericardial effusion.  Right ventricular volume was mildly
increased with right ventricular systolic function moderately reduced.
The patient had an endomyocardial biopsy on May 20, 2008, that showed
mild-to-moderate ---------- hypertrophy but no other active process.
On cardiopulmonary exercise testing in January 2010, VO2 was 8.2 with an
RER of 1.01.
IMPRESSION:
1.   Non-ischemic cardiomyopathy, ACC/AHA stage C, New York Heart
Association class II to III heart failure symptoms.  It is unclear the
etiology of his heart failure, which may be restrictive in nature.  His
VO2 of 8.2 performed this month shows poor exercise tolerance
 uantitatively and suggests that his disease process has worsened.  He
 ppears to be a potential candidate for cardiac transplantation.  He is
currently on medical therapy.
2.   Atrial fibrillation, currently on Coumadin.
3.   Chronic kidney disease with a baseline creatinine between 1.6 and
1.9, currently being evaluated by Nephrology.
4.   Diabetes mellitus on medical therapy.

. History of non-sustained ventricular tachycardia, currently being evaluated for potential implantable cardioverter defibrillator by Electrophysiology.

6. Hypertension on medical therapy.
7. Hyperlipidemia on medical therapy.

PLAN:

1. Cardiomyopathy. Given the difficulty in assessing the patient's volume status and plans previously for right heart catheterization, we will proceed with right heart catheterization in this individual. We do believe for the treatment of his cardiomyopathy from a medical perspective that he would benefit from ACE inhibitor therapy. As a result, we defer to Dr. Thorson, but do believe that ACE inhibitor therapy should be administered. It appears, looking through Nephrology's recommendations, that they do agree that ACE inhibitors would be beneficial to the kidneys as well. Given his poor VO2 of 8.2 on his examination in January 2010, we do believe it is reasonable to start the cardiac transplantation work-up process. We will start with a right heart catheterization to evaluate his filling pressures and decide he needs further aggressive therapy. From there, we will continue with a full cardiac transplantation work-up depending on the results of his right heart catheterization. Given his poor glomerular filtration rate and his baseline chronic kidney disease, he would have to be considered for potential heart and kidney transplantation if he were to be a candidate. Therefore, he would require referral to Kidney Transplant Unit for evaluation.

. Atrial fibrillation. He will continue on Coumadin.
. . Chronic kidney disease. He will need to be evaluated by Kidney Transplant Unit if we decide that he is a cardiac transplantation candidate.

4. Diabetes. He should continue on his diabetic regimen.
5. Hypertension. As stated previously, we encouraged institution of ACE inhibitor therapy as per Dr. Anne Thorson with frequent monitoring of his creatinine and potassium.

Thank you for allowing us to participate in the care of this gentleman. We will follow up the results of the above tests and see him in _ llowup, likely for consideration of full transplantation work-up.

Sincerely,

KATHLEEN L. TONG, M.D.
CLINICAL INSTRUCTOR

I have seen and examined the patient. I have reviewed and discussed the case with Dr. Jonathan C Hsu and agree with the findings and treatment plan as documented above.

EXTRA COPIES:
CARBON COPIES:
DICTATED BY:           Jonathan C Hsu, MD 72338
                       PRELIMINARY REPORT

ATTENDING PHYSICIAN:   Kathleen l Tong, M.D. 75450
D:    01/28/2010 12:30 P
T:    01/28/2010 03:28 P web  CS#: 2281069

```
          U.C.S.F. MEDICAL CENTER, STOR/CDS SYSTEM
```

Patient Name: ASPILLERA, HECTOR NOEL          Printed on 01-28-10 at 12:09 pm
MRN:          1286699-2                                            Z123
DOB:          03/16/1942

DOCUMENT # 2278223  Signed
VISIT #   17088801


                         UCSF CARDIOLOGY
350 Parnassus Avenue     505 Parnassus Avenue      1300 South Eliseo
Drive
Suite 300                Room M-1176               Suite 204, Greenbrae
Box 0327                 Box 0124                  Box 0327
San Francisco, CA 94143  San Francisco, CA 94143   San Francisco, CA
94143
  l: (415) 353-2873      Tel:  (415) 476-1326      Tel:  (415) 353-2873
Fax: (415) 353-2528      Fax: (415) 502-8627       Fax: (415) 353-2528
          CARDIOLOGY CLINIC AT 350 PARNASSUS
          CARDIOLOGY CLINIC AT 505 PARNASSUS
          CARDIOLOGY CLINIC AT GREENBRAE

RE:
U#: 12866992
`ATE OF SERVICE: 01/13/10
‿HIEF COMPLAINT/HISTORY OF PRESENT ILLNESS:  The patient returns to
Cardiology Clinic today, January 13, 2010, for a followup visit.  The
patient was recently hospitalized for decompensated congestive heart
failure and acute-on-chronic renal failure.  He had initiation of
intravenous dobutamine therapy and intravenous diuretics.  He was seen
in consultation by the renal service, who did not feel dialysis was
necessary at this time.  He diuresed well over the course of the
hospitalization and was discharged home with outpatient followup.
He states that, since he has been home from the hospital, he has
‿enerally felt much better.  Specifically, his appetite has improved,
and he feels less fatigued and less short of breath.  He denies any
chest discomfort, arm, neck, or jaw pain.  He does not experience
shortness of breath at rest but continues to have dyspnea on
mild-to-moderate exertion, although he feels that this is improved since
discharge from the hospital.
He denies paroxysmal nocturnal dyspnea, orthopnea, or increased lower
extremity edema.  He does note occasional palpitations or skipped
heartbeats and rare episodes of lightheadedness.  He has not had any
syncope.
PAST MEDICAL HISTORY:  Past medical history is significant for:
1.  Nonischemic dilated cardiomyopathy.
2.  Acute-on-chronic renal failure.
3.  Anemia.
4.  Atrial fibrillation.
5.  Chronic anticoagulation therapy.
 .  Diabetes mellitus.
7.  Hypertension.
8.  Hyperlipidemia.
CURRENT MEDICATIONS:  Current medications are as listed on the STOR
sheet.
ALLERGIES:  He has no known drug allergies.
```

FAMILY HISTORY:  This was reviewed from hospitalization date December 31, 2009, and is without significant change.

SOCIAL HISTORY:  This was reviewed from hospitalization date December 31, 2009, and is without significant change.

REVIEW OF SYSTEMS:  Review of systems is pertinent for occasional difficulty sleeping, intermittent fatigue, dyspnea on exertion (as above), occasional nocturia, and decreased appetite.  The remainder of the review of systems is negative.

PHYSICAL EXAMINATION:

VITAL SIGNS:  On physical examination today, blood pressure is 110/70.  Heart rate is 80.  Respirations are 16.  Oxygen saturation is 97% on room air.

GENERAL:  He is a well-developed, well-nourished male in no acute distress.

HEENT:  HEENT is atraumatic, normocephalic.  Eyes show pupils are equal, round, and reactive to light.  External ocular movements are intact.  Sclerae are anicteric.  Oropharynx is clear.

NECK:  Neck is supple with no lymphadenopathy or thyromegaly.  Jugular nous pressure is 10 cm.  Carotid upstroke is normal without bruit.

CHEST:  Chest exam reveals decreased breath sounds at the bases with bibasilar crackles.  There are no wheezes.

CARDIAC:  Cardiac exam reveals an irregularly irregular rhythm with intermittent S3.  There is a grade 2/6 systolic ejection murmur heard at the left sternal border.

ABDOMEN:  Abdomen is soft and nontender.  I could not appreciate a liver dge.

EXTREMITIES:  Extremity exam reveals no cyanosis, clubbing, or edema.  Distal pulses are 1+ and symmetric.

NEUROLOGIC:  Neurologic exam is nonfocal.

LABORATORY DATA:  Most recent laboratory data available for review demonstrates a hematocrit of 33, potassium 3.7, BUN 44, creatinine 3.11, glucose 93, and normal liver function tests.

IMPRESSION/PLAN:

1.  Ischemic cardiomyopathy with class III New York Heart Association symptoms, improved with additional diuresis.  We will continue his current medication regimen.  I will check laboratories today to check his potassium and his renal function.

2.  Palpitations, with known nonsustained ventricular tachycardia.  We will repeat his event monitor now.  I suspect that he will continue to exhibit some nonsustained ventricular tachycardia and could benefit from implantable cardioverter-defibrillator placement.  He has seen Dr. Natish Badhwar in Electrophysiology in the past for consideration of biventricular pacing and implantable cardioverter-defibrillator placement.  I will refer him back to Dr. Badhwar for further discussion given his deterioration in status.

3.  Decompensated heart failure.  I will send the patient for a maximal venous oxygen consumption study to see whether he should  now be referred for possible heart ransplant given his  recent decompensation.  He will see me in followup after the exercise study has been performed and I will refer him to the CHF/Transplant clinic.

ANNE I. THORSON, M.D.
ASSOCIATE CLINICAL PROFESSOR
CARDIOLOGY FACULTY PRACTICE

EXTRA COPIES:

CARBON COPIES:

DICTATED BY:                     Anne I. Thorson, MD 12344
                                 Electronically Signed by

Anne I. Thorson, MD 01/26/2010 05:42 P

Anne I. Thorson, MD 12344

ATTENDING PHYSICIAN:
D:   01/26/2010 06:04 A
T:   01/26/2010 06:33 A wds   CS#: 2278223