DONALD THOMAS BERGERSON
CSB No. 91263
15 Boardman Place, Suite 2D
San Francisco, CA., 94103
Telephone: (415) 621-8149
Facsimile  : (415) 920-9288

Attorney for Defendant,
LILY ASPILLERA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA,
SAN FRANCISCO VENUE

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 3:09-CR-1102-SI |
| Plaintiff, | SENTENCING MEMORANDUM OF LILY ASPILLERA |
| vs. | |
| LILY ASPILLERA, | |
| Defendant. | |

Defendant Aspillera submits the following memorandum with respect to her sentence in this case. In that she is already in possession of the Government's memorandum filed three days ago, she will incorporate into the instant pleading her comments on that one.

1. <u>Introduction</u>: What makes this case most difficult for all concerned is that the Government's sentencing memorandum is, within the narrow confines of its analysis, close to the mark.  Ms, Aspillera's conduct *was* a "long running scheme" (Doc. 36:4:11) for personal gain as described by the Government. In her statement accepting responsibility [PSI ¶24], which the Government believes to be sincere (Doc. 36:4:2), Ms. Aspillera joins in the assessment.

That, however, is the *start*, not the conclusion of the inquiry. Still remaining is the overarching riddle of why this elderly woman of otherwise unblemished

–1–

morals would have offended so spectacularly. That "why" question is, in turn, amongst the array of *many* questions which must be answered when this Court calculates its sentence consonant with the Sentencing Reform Act as implemented in 18 USC § 3553(a).

In the following discussion, the defense will show that this broader inquiry leads to a result much different from that advocated by the Government. The ends of justice and the aims of Federal sentencing will be satisfied by punishment much less severe than that recommended. To that analysis, Ms. Aspillera now turns.

2. <u>Governing Law</u>: An extended discussion of post-*Booker* [*United States v. Booker* 543 U.S. 220, 125 S.Ct. 738 (2005)] sentencing procedures is not necessary. The lynchpin of accurate sentencing in the Federal Courts is now "reasonableness" within the meaning of 18 USC § 3553(a), with the individual Judge and the Sentencing Commission "carrying out the same basic § 3553(a) objectives, the one at retail, the other at wholesale," [*Rita v. United States* 551 U.S. 338, 348, 127 S.Ct. 2456 (2007)]. When computing a "reasonable" sentence, "a district court should begin … by correctly calculating the applicable Guidelines range" [*Gall v. United States* 552 U.S. 38, 49, 128 S.Ct. 586 (2007), citing *Rita, supra,* 551 U.S. at 347-348], which should then be modified as necessary to reach a sentence in accord with § 3553(a). In this latter regard, "when a party raises a specific, nonfrivolous argument tethered to a relevant § 3553(a) factor in support of a requested sentence, then the judge should normally explain why he accepts or rejects the party's position" [*United States v. Carty* 520 F.3rd 984, 992-993 (9th Cir.) (*en banc*), *cert. den.* 553 U.S. 1061, 128 S.Ct. 2491 (2008)]. The most useful role a party can play in

assisting the Court, therefore, is to bring to the Court's attention the specific pertinent facts of the case and discuss them in terms of the considerations set out in § 3553(a). Below, Ms. Aspillera attempts to do just that.

3. <u>Guidelines Foundation for the Sentence</u>: An exchange of information pursuant to Crim. L-R 32-4(b) and (c)(2) has resolved ten issues and left unresolved a single issue in the Presentence Report and its Guidelines calculation. The unresolved issue, and Ms. Aspillera's position on it is as follows:

In ¶ 31 of the Presentence Report, the Officer states that Ms. Aspillera's Guidelines score should be increased by two points because she occupied a position of special trust or skill[1] within the meaning of USSG § 3B1.3. The defense respectfully objects. App. n. 1 to the Guideline provides that the adjustment is triggered by two findings: (1) that the defendant exercised "professional or managerial *discretion*" (emph. added) [*see, United States v. Contreras* 581 F.3rd 1163, 1165-1166, 1168 & n. 5 (9th Cir. 2009), *aff'd and modif.* 593 F.3rd 1135 (9th Cir. 2009) (*en banc*)]] *i.e.* "substantial discretionary judgment that is ordinarily given considerable deference" [*United States v. West* 56 F.3rd 216, 220, 221 (9th Cir. 1995, quoting the note)] and (2) that the defendant's position vis-à-vis the defendant facilitated his or her commission or concealment of the offense. Imposition of the § 3B11.3 adjustment is unwarranted in this case because Ms. Aspillera was never in

---

[1] According to App. n. 5 to USSG § 1B1.3, the "special skill" adjustment applies to credentialed or otherwise specially-trained persons such as "pilots, lawyers, doctors, accountants, chemists, and demolition experts". The Proposed PSI at ¶¶ 62-65 reflects that Aspillera has no such special training. Although she majored in business, she did not complete college. Her only special certificates are in interior design and her only special training is in stenography. The "special skill" half of the adjustment therefore does not apply at bar.

a discretionary position with respect to KK's funds, and satisfaction of this element is "the decisive factor" [*Contreras, supra,* 581 F. 3rd at 1166] in adjusting pursuant to §2 3B1.3. Instead, it appears that, as an employee of an accounting firm, she was tasked with paying bills and other fixed expenses as instructed by KK, who was the firm's client. Although this placed her in a position to divert some of KK's funds to her own use, she was not providing discretionary management services to KK of the sort which ordinarily trigger application of the adjustment. In *United States v. Tatum* 518 F.3rd 369 (6th Cir. 2008) the defendant, an office manager, was tasked with preparing, but not authorized to sign, checks for company expenditures, Her fraud consisted of preparing surplus checks made out to her over her boss's forged signature, then taking steps to conceal the discovery of the returned checks. The sentencing Court found that Tatum had acquired special skills through her on the job training and that her position was one of trust. The Court of Appeals disagreed, noting that the gravamen of the position of trust adjustment is that the defendant has placed himself in a position where the victim defers to the defendant's judgment [*Tatum, supra,* 518 F.3rd at 373], for example, an executive director or other fiduciary-like manager with "substantially more discretion and authority than that of an officer manager". It is understood that each case is fact-specific, but *Tatum* is illustrative of the core principal at issue here – that merely being "untrustworthy" in the sense that *any* embezzler is, is not the same thing as abusing a position of trust pursuant to § 3B1.3; were it otherwise, the adjustment would apply in every case, and thus "convert[] the position of every person who handles property into one of trust" [*United States v. Smaw* 306 U.S. App. D.C., 22 F.3rd 330, 332 (D.C. Cir.

1994)] such that what is supposed to be an exception would essentially swallow the rule in most or all cases. This outcome must be avoided, and the decisional law being clear, must be avoided in this case by declining to impose the two point adjustment.

For this reason, Ms. Aspillera submits that her true adjusted Guidelines score should be not 22, but 19. The resulting sentence calculation under the Table is 30 to 37 months.

4. Analysis of 18 USC § 3553(a) Factors:

The foregoing aside, Ms. Aspillera respectfully requests that the Court sentence her to a sentence lower than that set out in the Guidelines.

A) Background: The Good Report and the Medical Histories

In Docs 37 and 39, Ms. Aspillera has filed exhibit-documents relevant to the statutory sentencing factors. Those in Doc. 39 – a series of letters from Ms. Aspillera's family – are orthodox and speak for themselves, at least to the point that more elaboration from the undersigned would be superfluous[2]. The two sets of documents filed as Doc. 37 merit additional comment.

Paul Good, PhD is a forensic psychologist with a sub-specialty in the assessment of persons "in trouble" for financial crimes, often due to impulsive behaviors such as shoplifting or compulsive gambling. Dr. Good met with Ms.

---

[2] Actually, an observation *is* in order. Ms. Aspillera is of retirement age, active in her church, and would ordinarily be in a position to provide additional letters in support. Without violating client confidence, the undersigned would proffer to the Court that the reason these are missing is that Ms. Aspillera has been too mortified to solicit them. In fact, she has, but for her immediate family, endured her ordeal alone. We will not belabor this, since it appears that the Government concedes Ms. Aspillera's genuine remorse, but it is a fact that in 31 years of practice, the undersigned has, frankly, *never* encountered a client so humiliated, embarrassed and reticent as Ms. Aspillera ,

–5–

Aspillera on several occasions and administered a battery of psychometric testing instruments on her. These revealed Ms. Aspillera to be a conventional, moral woman with a fine work ethic (Good Rept. at pp. 4-9[3]), prompting Dr. Good to pose the most obvious question at bar: "what would lead this woman, who had no history of anti-social behavior and no criminal record, to repeatedly suspend her moral compass and behave in a way that was so out of character?"

Dr. Good offers two answers. The first is that the embezzlements started out small and not entirely motivated by greed, specifically in that it appears that Ms. Aspillera's initial thefts were to provide support for her terminally-ill sister [Good Rept. at pp. 2-3, 8] but soon grew into a compulsive "addiction" [*Id.* at 8 ¶ 2 quoting defendant]. The second is "the role played by the tremendous vulnerability and anxiety about death that crept into her life at about the same time she started to embezzle funds." The Court has been made generally familiar with the mortality issues via the Presentence Report [PSR ¶¶ 54, 59, 60]:, as well as, now, by Dr. Good's recitation: Ms. Aspillera has undergone a continuing health crisis commencing in 2003 with three heart attacks, bypass and angioplasty, resulting in a current guarded prognosis under a significant array of medication; meanwhile,

---

[3] The notable "outlier" feature in Ms. Aspillera's evaluation was her apparently limited intelligence as reflected on IQ testing. It appears unclear whether this reflects depression at her current dilemma, organic damage due to her circulatory problems (*post.*) or an innate limitation. If it is the product of either of the latter causes, the information would be mitigating of Ms. Aspillera's crime, since Dr. Good's analysis places her impaired judgment as occurring along the same time frame as her circulatory illnesses. Whatever the relationship between her apparent impairment and the instant offense, it is appropriate to note that the offense did not of itself require superior intellect to carry-out: Ms. Aspillera was given responsibility to pay Mr. K.K.'s bills and diverted money to her own usage. Although she took some measures to act in secret, the record is lacking any evidence of sophisticated tools of concealment such as pseudonymous bank accounts, submission of false 'double' record-keeping and the like.

her husband , who stopped work in the 1990s due to illness,  is now facing multiple organ transplants having, suffered strokes and undergone brain surgery this year[4]; and in 2004, her sister became terminally ill with cancer. As a result of the mounting toll of illness, by 2004, after  Ms. Aspillera's second heart attack, "this woman was face to face with death, her own and that of members of her family. It was terrifying and she lacked the psychological maturity to cope with such stress. The fact that her husband was no longer working due to his medical condition placed even more strain on her. The reality was that she had a good job, was making a good salary and didn't need to steal from her client. The impulse was irrational, and in my analysis, came from a sense of fragility and fear. In an unconscious calculation, the funds she stole were proportional to the level of her anxiety and an attempt to allay her concerns about death and dying." (*Id.* at 8 ¶¶ 3-4) Ms. Aspillera's personality strengths ((her assertiveness and sense of responsibility) acted in synergy with its deficits (her compulsivity and rigidity) provided the psychological frame upon which Ms. Aspillera "built" her tragic, self-destructive scheme of embezzlement.

---

[4] As part of Doc. 37, Ms. Aspillera has annexed representative records corroborating these health matters. The entire chart package is hopelessly bulky – it runs to well over 2000 pages for each of Mr. and Ms. Aspillera – and the information provided is not entirely current, since it took the UCSF record-retrieval  center so long to assemble records from earlier this year that they do not include Mr. Aspillera's recent brain and eye surgeries. As is apparent from the last setting-stipulation respecting this sentencing hearing as well as the letter which the undersigned intends to send to the Court at the time of submission of this memorandum, the ongoing nature of the health problems (particularly Mr. Aspillera's) has been so disruptive as to have delayed, on several occasions, the presentation of both Dr. Good's study and the health records themselves. The undersigned does not believe that the Government disputes Ms. Aspillera's health problems or those of her husband, and indeed, it makes reference to them as a mitigating factor in its own sentencing memorandum. (Doc. 36:4:4-5)

This is not an excuse for her crime, nor is it offered as such. It *is* however a rational entry-point into the § 3553(a) analysis in this case. § 3553(a) contemplates, above all, "a sentence sufficient, but not greater than necessary" to comply with the sentencing objectives delineated in the statute. In this respect, factor (1)," the nature and circumstances of the offense and the history and characteristics of the defendant" presents the greatest analytical difficulty, because the two clauses of the sentence are in many ways opposed with respect to this defendant: by any measure embezzlement of at-or-near two million dollars is a significant criminal act, but by any measure, Ms. Aspillera is otherwise a sympathetic figure who had a long and productive career. If Dr. Good's assessment is incorporated into the mix, the two ends of the dilemma begin to approach one another: Ms. Aspillera's conventional life-approach gave her both the opportunity to be trusted with the funds; the inability to deal with an emotional crisis which might have been less daunting to one less rigid; and the ability to carry through with her theft, even while overwhelmed with a sense of guilt, because her need to overcome anxiety when faced with her own mortality and that of her loved ones prompted her to an impulsive course of conduct which overcame her conscience. Even if Dr. Good's analysis is dispensed with, the same factors still come into play, albeit without the unifying framework of his assessment: this is a good woman who did a bad thing for uniquely personal reasons not likely to recur. As such, the Government is correct in noting that whatever sentence is imposed, Ms. Aspillera is unlikely to re-offend (Doc. 36:4:3), although in light of what has been said, it is perhaps uncharitable to speculate that this is primarily due to the fact that her conviction will deny her the

opportunity to commit a like offense. A more likely explanation is that offered by both Dr. Good and by Ms. Aspillera herself, as confirmed by both the Probation Officer and the Attorney for the Government: this woman is simply overcome by remorse, and will never offend again. In light of this, the reality that Ms. Aspillera has retired from any future criminality and bears in her own conscience a sense of punishment which will no doubt cause her as much or more pain than any period of imprisonment, it is submitted that *all* of the considerations set out in the remainder of § 3553(a)(2) can be met by a minimal term of imprisonment or even no imprisonment at all.

To this is added the reality that beyond any ordeal of a prison sentence, Ms. Aspillera's far-greater emotional hurdle is about to come when her husband is subjected to his forthcoming transplant surgery. Ms. Aspillera has, beyond all else, expressed to the undersigned and the investigating Probation Officer a sense of responsibility to her husband, a dread that she might find herself confined when he needs her most, and a concomitant dread that he might undergo the trauma without her to provide for him. To be sure, she has her own health worries, but these are dwarfed by the ongoing crisis with respect to her husband. Of course, the calculus is made difficult because of the vagaries of medical prediction. We do not know when Mr. Aspillera may undergo his transplant of how he will respond to it. It is, sadly, not unrealistic to imagine that he might not survive to have it; it is far less likely, but still possible, that he will stabilize without it.

All that said, in the context of all of the factors of a most unusual case – a crime of trust-breach committed by a woman whose entire life *but* for the crime

commends credit for the trust it instilled; a crime committed by a woman in her twilight years with a husband in an ongoing health crisis; and an offense for which Ms. Aspillera has been punished by her own conscience as much as she can be punished by any term of imprisonment – the defense respectfully recommends the following:

    1) That Ms. Aspillera be sentenced to that term of imprisonment under "Zone B" which provides for a short period in custody followed by the maximum permissible period of home confinement under the sentencing table;

    2) That as a condition of her supervised release, Ms. Aspillera be ordered to submit to home confinement via bracelet monitoring subject only to working (if she obtains a job) and the care and maintenance of her husband;

    3) An order, hence a lifelong obligation, to make restitution.

*No* solution in this case is a totally "just" one, but the recommendation by the defense fits most squarely into the objectives of the Sentencing Reform Act in that it constitutes a significant, but not greater than necessary sentence, for an offense, the gravity of which is apparent to no one in this room more than it is to the defendant.

DATED: October 23, 2010

    Respectfully Submitted:

    //s// Donald Thomas Bergerson

    _____
    DONALD THOMAS BERGERSON
    CSBN 91263
    15 Boardman Place, Ste. 2D
    San Francisco, CA., 94103
    Telephone: (415) 621-8149
    mrwork1@gmail.com
    Attorney for Defrendant, ASPILLERA

## PROOF OF SERVICE

The within SENTENCING MEMORANDUM was served electronically on the United States Attorney, attn. W. Douglas Sprague AUSA by the Court's electronic filing service and on Assistant Probation Officer Karen Mar, by United States Mail, postage prepaid, at 1301 Clay Street, Ste. 220 S, Oakland, CA., 94612-5217, and I so declare under penalty of perjury save where alleged on information and belief, which portions I believe to be true. EXECUTED: City and County of San Francisco, Northern District of California, this October 24, 2010

by: //s// Donald Thomas Bergerson

_____
DONALD THOMAS BERGERSON